**FORD MOTOR COMPANY, Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

Civ. No. 74–72666.

United States District Court,
E. D. Michigan, S. D.

July 23, 1980.

John L. Hopkins, Jr., Denenberg, Tuffley, Thorpe, Bocan & Patrick, Southfield, Mich., for plaintiff.

John A. Kruse, Michael F. Schmidt, Harvey, Kruse & Westen, Detroit, Mich., for defendant.

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANT

COHN, District Judge.

I have before me cross-motions for summary judgment. They require an interpretation of the property damage provisions of Michigan's no-fault automobile law, Act 294 of the Michigan Public Acts of 1972, M.C.L. § 500.3101 et seq. (the Act).[1]

Ford Motor Company (Ford) says Insurance Company of North America (INA) is liable to it under these provisions as an insurer for damage done to its Flat Rock, Michigan casting plant when the contents of INA's insured's tank truck were pumped into the wrong tank and an explosion followed. Ford says that INA, as a no-fault insurer, is liable because the accident "[arose] out of the . . . use of a motor vehicle as a motor vehicle," Section 3121 of the Act, or alternatively because of a policy endorsement covering "loading and unloading" INA issued or was obligated under.

INA takes a contrary position; asserting first there was no endorsement and second that under the language of the Act it is not liable because the explosion was caused by the action of a Ford employee controlling and misdirecting the contents of the tank truck into the wrong tank.

INA is correct; it is entitled to summary judgment for the reasons it asserts.

### I.

The undisputed facts are as follows:[2]

On October 29, 1973 a tank truck owned by Refiners Transport & Terminal Corporation (Refiners) and insured by INA, driven by a Refiners' employee, carrying 2,500 gallons of a catalyst from another Ford plant, arrived at the Flat Rock plant. At the receiving area a sample was drawn from the tank truck to cross-check its contents against the invoice. The contents were determined to match specifications and the contents verified as a catalyst. The tank truck was sent to the basement storage area accompanied by an employee of Ford. *Ford's employee incorrectly* pointed out a resin tank to the driver of the tank truck rather than a catalyst tank. The tank truck was then connected to the resin tank by the Ford employee and the Ford employee started a Ford pump connected to the resin tank which pumped the catalyst from the tank truck into the resin tank. After the transfer was complete the tank truck was driven back to the receiving area where a Ford employee signed a bill of lading indicating that the delivery had been completed. The tank truck left the plant premises at 9:23 a. m. At approximately 9:51 a. m. an explosion caused by the catalyst reacting with the resin in the tank occurred causing considerable damage to the tank and plant property.

Both the Ford tank and the tank truck were equipped with pumps capable of pumping out the tank truck.

Under Ford's established procedure a Ford employee would accompany tank trucks to the unloading area and use Ford pumps rather than a pump on the tank truck. The procedure was designed by Ford to avoid the possibility that an unaccompanied tank truck driver might make a mistake, something that had nearly happened on several occasions.

The tank truck was licensed, titled and registered in Michigan.

Ford seeks recovery pursuant to the property protection provisions of the no-fault automobile[3] insurance provided by INA to

---

1. Citations are to sections of the Act. The Act was signed into law on October 31, 1972 and became effective October 1, 1973.

2. The facts are taken from the Joint Pre-Trial Statement, an undisputed affidavit of the driver of the tank truck and admissions and acknowledgements in a series of letters from the parties to the Court following oral argument.

3. The terms "automobile" and "motor vehicle" are used inter-changeably. The Act uses the term "motor vehicle." Insurance policies and certain sections of the Michigan Insurance Code of 1956, Act 218 of the Michigan Public Acts of 1956, M.C.L. § 500.100, et seq., of which the Act is Chapter 31, use the term "automobile."

Refiners, which insurance became effective on October 1, 1973 with the passage of the Act. Refiners was not issued a Michigan no-fault endorsement by INA subsequent to October 1, 1973; but the automobile insurance policy provided by INA to Refiners contained a uniform endorsement, the agreed effect of which was to automatically conform the INA policy to the requirements of the laws of any state in which the insured's vehicle was operating.

## II.

This case has a long, somewhat tortured, and interesting history. Ford started suit in October, 1974. INA moved to dismiss on the grounds there was no diversity citing 28 U.S.C. § 1332(c), which provides that an insurer and its insured are citizens of the same state for purposes of diversity jurisdiction when suit is brought under a direct action statute.[4]

In December, 1976 this motion was denied by the late Judge Lawrence Gubow. He held that Ford's suit was not a "direct action" but rather that INA was the real party in interest with the question before the court relating to either statutory interpretation or coverage.

INA then moved for summary judgment. While Judge Gubow, contrary to my conclusion, found the explosion arose out of the "unloading", he granted the motion on the grounds the decision of the Michigan Court of Appeals holding the property protection provisions of the Act unconstitutional, *Shavers v. Attorney General*, 65 Mich.App. 355, 237 N.W.2d 325 (1975), precluded recovery by Ford. He further held that the contractual language of the policy,[5] depending as it did on a statute, was of no effect since the statute itself was unconstitutional.

In June, 1977 Judge Gubow stayed his judgment pending a decision by the Supreme Court of Michigan on the constitutionality of the Act. When the Supreme Court reversed the Court of Appeals, *Shavers v. Attorney General*, 402 Mich. 554, 267 N.W.2d 72 (1978), and held the property protection provisions constitutional the judgment was vacated.

In April, 1980 I entered an order bifurcating liability and damages, Fed.R.Civ.P. 42(b).

## III.

### A.

The Act provides in pertinent part:

Section 3101

(1) The owner or registrant of a motor vehicle required to be registered in this state shall maintain security for payment of benefits under . . . property protection insurance. . .

. . . . .

(3) Security may be provided under a policy issued by an insurer . . . . . .

Section 3121

(1) Under property protection insurance an insurer is liable to pay benefits for accidental damage to tangible property arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle . . . . .

(2) Property protection insurance benefits are due under the conditions stated in this chapter without regard to fault.

(3) Damage to tangible property consists of physical injury or destruction of the property and loss of use of the property so injured or destroyed.

. . . . .

Section 3125

A person suffering accidental property damage shall claim property protection

---

**4.** See discussion in Wright, *Law of Federal Courts*, § 27, pp. 105–106.

**5.** Apparently the parties stipulated that the effective insurance contract incorporated INA's standard no-fault endorsement. This is of course contrary to the agreed upon facts in the joint pre-trial statement, *supra*. Additionally, I am satisfied from an examination of the briefs that the parties presented a sketchy and misleading description to Judge Gubow of the facts underlying the explosion, and in particular the extent of Ford's participation in the direction of events preceding and accompanying the unloading of the tank truck.

insurance benefits from insurers in the following order of priority: insurers of owners or registrants of vehicles involved in the accident; and insurers of operators of vehicles involved in the accident.

### B.

As described in *Shavers, supra,* 402 Mich. 554, particularly at pp. 625–632, 267 N.W.2d 72, and in an earlier decision of the Michigan Supreme Court,[6] the Act was the product of a seven-year effort to reform Michigan's system of compensation for personal injury and property damage caused by motor vehicle damage. Prior to its enactment recovery depended on a finding of fault. What the Act did was to substitute for the existing system of fault-based tort liability insurance a unified statutory system of recovery for personal injury and property damage regardless of fault based primarily on a mandatory system of insurance.

As part of the scheme of the Act and as part of an effort to unify the no-fault system each driver or owner of a motor vehicle is required to maintain insurance to compensate third-parties for damage to and loss of use of non-vehicular property and legally parked vehicles arising from an automobile accident regardless of fault. The benefits under any one insurance policy are limited to $1,000,000.00, Sections 3101(1), 3121 and 3123 of the Act.

In other words under the property protection provisions of the Act owners of tangible property involved in an accident with a motor vehicle collect from the insurer of the motor vehicle which inflicted the damage. This is so because the motor vehicle is usually at fault and, therefore, the Act makes the owner or operator of the motor vehicle, as part of its scheme, liable for the damage done and requires the purchase of insurance to assure payment for such damage.[7]

### C.

Somewhat complicating the question of INA's liability is the fact that while the parties agree that INA never issued a Michigan no-fault endorsement to Refiners subsequent to October 1, 1973, but rather the Refiners policy contained a uniform endorsement the agreed effect of which was to conform the policy to the laws of Michigan, the policy contained a definition of "property damage" and the standard form of no-fault endorsement filed with the Michigan Department of Insurance by INA and by a rating organization it belonged to contained language broader than the Act.

The definitional section of the Refiners policy contained the following:

"When used in this policy (including endorsements forming a part hereof):

PROPERTY DAMAGE: 'property damage' means injury to or destruction of tangible property arising out of the ownership, maintenance, or use, including loading and unloading of any covered automobile."

INA's standard form of no-fault endorsement filed with the Michigan Department of Insurance under the section relating to property protection coverage reads as follows:

"The company will pay, in accordance with Chapter 31 of the Michigan Insurance Code, for damage to tangible property caused by accident and arising out of the ownership, operation, maintenance or use, including loading and unloading, of the insured motor vehicle as a motor vehicle."

This same form of endorsement was also filed with the Department of Insurance by Insurance Services Office a rating organization INA belonged to.

---

**6.** *Advisory Opinion re Constitutionality of 1972 P.A. 294*, 389 Mich. 441, 208 N.W.2d 469 (1973).

**7.** The Supreme Court recognized that the motorist insurer might be liable on occasions to "the owners of stray animals, trains or other non-stationary tangible property which may oc-

casion the damage." *Shavers, supra*, 402 Mich. 557 at 631–632 footnote 58, 267 N.W.2d 72 at 103 footnote 58. Also, there is now an exception relating to *illegally placed utility lines; See*, Section 3123(3) of the Act added by Act 65 of the Michigan Public Acts of 1973.

## IV.

Ford's approach to INA's liability is two-fold. First it argues that by policy definition and by statute INA is obligated for property damage "arising out of the use of a motor vehicle as a motor vehicle including *loading* and *unloading*," as part of the policy issued to Refiners. Second, it argues that by the Act INA is obligated for property damage "arising out of the use of a motor vehicle as a motor vehicle" and "use" includes "loading and unloading." In either case Ford says that the property damage which it suffered is covered.

### A.

In support of the first approach Ford cites the definition of property damage from the INA policy and the standard no-fault endorsement form quoted above both of which include the terms "loading and unloading."

As to the latter it points out that Section 2236 of the Michigan Insurance Code of 1956, M.C.L. § 500.2236, provides among other things that no policy form is to be used by an insurer unless approved by the Commissioner of Insurance and that an insurer belonging to a rating organization may satisfy this obligation by adhering to a filing by such organization. From this Ford goes on to argue that since the no-fault endorsement form using the "loading and unloading" phrase was filed either by INA or by the rating organization, INA is obligated notwithstanding the fact that an endorsement to that effect was never delivered to Refiners.

Ford claims too much.

■ First, as to the definition of property damage in the policy, that is a matter between INA and Refiners, i. e., the scope of the obligation of INA to Refiners under the contract of insurance between them. There is no authority cited for the proposition that the definition of property damage in an automobile liability policy issued prior to the effective date of the Act has any relevance to an insurer's obligations under the Act.

■ As to the policy form filings, either by INA or by Insurance Services Office, no authority is cited that because of the form was filed with and approved by the state it became part of contract of insurance with an insured who was never delivered the form.

■ There is a statutory prohibition in Michigan against naming an insurer in a damage action against the insured. M.C.L. § 500.3030, *Stevens v. City of St. Clair Shores*, 366 Mich. 341, 115 N.W.2d 69 (1962). This means there is no direct right of action by an injured third-party against an insurer. To the extent that the policy definition may enlarge INA's liability to Refiners I am of the opinion that is a matter solely between INA and Refiners. As to the filing of the policy form and INA's obligations as a consequence that is also between INA and Refiners, even assuming the filing of the form enlarges INA's obligations.

I have reviewed the authority Ford cites. It is not in point. In *Lundberg v. Interstate Business Men's Acc. Association*, 162 Wis. 474, 156 N.W. 482 (1916) a beneficiary under an accidental death benefit policy attempting to void a limitation on liability in the policy argued that the limitation language in the policy did not conform to a statutory requirement as to type size. The Wisconsin Insurance Commission had approved the policy form as being in accordance with statutory requirements. The Supreme Court of Wisconsin simply held that it would not allow a collateral attack on the Commissioner's factual determination that the policy form met statutory requirements as to print size. The decision has no application here.

Ford also cites Section 3163 of the Act and an unreported opinion of Judge Robert B. Webster of the Oakland County, Michigan, Circuit Court (No. 77–156–693–CK, March 10, 1978). Again there is no application. Section 3163 of the Act provides that an insurer authorized to transact business in Michigan is required to file and maintain a written certification to the effect that if one of its out-of-state insureds is involved

in a motor vehicle accident the provisions of the Act apply. Judge Webster held the provision applied in an accident in Michigan involving an out-of-state resident insured by a company which had filed the certification and was doing business in Michigan. He said:

"The court is further satisfied that the personal protection insurance benefits extended are those contained within the no-fault act, and not those contained within the insurance policy originally issued in the foreign state. Accordingly, consideration of the Florida insurance policy as determinative of the benefits extended to a Florida resident insured of Allstate Insurance Company, when injured as the result of the ownership, operation, maintenance, or use of a motor vehicle in this state, is inappropriate. This court is satisfied that Allstate Insurance Company is liable in the same manner as though these plaintiffs were residents of the State of Michigan and insured under a policy of no-fault insurance issued by Allstate to a Michigan resident."

Judge Webster's decision rather than supporting Ford, reinforces my conclusion that the rights and obligations of Ford and INA are governed solely by the provision of the Act under the circumstances here obtaining.

### B.

Having reached the conclusion that the obligations of INA to Ford are to be measured by the obligation imposed on INA under the Act, and particularly Section 3121, the question to be answered is whether the property damage suffered by Ford "[arose] out of the use of a motor vehicle as a motor vehicle."

There is a dearth of authority interpreting Section 3121. *McPherson v. Auto-Owners Insurance Co.*, 90 Mich.App. 215, 282 N.W.2d 289 (1979) suggests the appropriate approach in interpreting the Act is to look to prior judicial interpretations of similar language in insurance policies. In this connection there are two annotations which are helpful: *Automobile Liability Insurance:*

*What Are Accident Or Injuries "arising out of ownership maintenance or use" Insured Vehicle*, 89 A.L.R.2d 150 (1960) and *Risks Within "Loading and Unloading" Clause of Motor Vehicle Liability Insurance Policy*, 95 A.L.R.2d 1122 (1961).

The separate discussions of "arising out of ownership maintenance or use" and "loading and unloading" would seem to indicate that a "loading and unloading" proviso enlarges the scope of coverage because "a broad[er] construction prevents the clause from being consumed by the term 'use'." *Dembinski v. Aetna Casualty & Surety Co.*, 76 Mich.App. 181, 183, 256 N.W.2d 69, 70 (1977). Whether enlarged or not I am satisfied the result here would be the same.

### 1.

The analog of Section 3121 of the Act for persons is Section 3105(1) of the Act. The cases interpreting this section offer considerable help. Section 3105(1) reads in part:

"(1) Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle . . . . ."

■ In construing a statute it is ordinarily regarded as reasonable to conclude that the same words in different parts of this statute have the same meaning. 73 Am. Jur.2d *Statutes* § 232 (1974).

The first Michigan case to deal with the interpretation of the words "arising out of the use" in the Act was *Kangas v. Aetna Casualty & Surety Company*, 64 Mich.App. 1, 235 N.W.2d 42 (1975). In *Kangas* an insured who was involved in an assault that arose after his vehicle stopped and he and several others got out and became involved in an altercation, was denied coverage on the grounds there was no causal connection between the injury sustained and the ownership, operation, maintenance or use of the automobile. The Michigan Court of Appeals said that the causal connection must

be more than "incidental, fortuitous or but for. The injury must be foreseeably identifiable with the normal use, maintenance and ownership of the vehicle," 64 Mich.App. at 17, 235 N.W.2d at 50.

In *O'Key v. State Farm Mutual Automobile Insurance Company*, 89 Mich.App. 526, 280 N.W.2d 583 (1979) a plaintiff who was shot while sitting in an automobile with the motor running was denied no fault benefits. There the Michigan Court of Appeals held that the role of the automobile was incidental and plaintiff's occupancy was a fortuity in no way connected with the assault.

In *Hamka v. Automobile Club of Michigan*, 89 Mich.App. 644, 280 N.W.2d 512 (1979), the occupant of an automobile who was assaulted by a pedestrian was denied no fault benefits.

In *Shinabarger v. Citizens Mutual Insurance Company*, 90 Mich.App. 307, 282 N.W.2d 301 (1979), the Michigan Court of Appeals reversed a summary judgment, in favor of the family of a man who had been fatally wounded when a shotgun he was handing to a friend seated in an automobile accidentally discharged as he was entering the automobile. Section 3106 of the Act requires as to parked automobiles in addition to the "arising out of use" requirement that the injury be "sustained by a person while occupying, entering into or alighting from the vehicle." The reversal was premised on the failure of the record to clearly reveal whether the accident occurred during the loading process and if it did, "whether there was a causal connection between the loading process and the injury." 90 Mich.App. at 316, 282 N.W.2d at 306.

In *Williams v. Citizens Mutual Insurance Company*, 94 Mich.App. 762, 290 N.W.2d 76 (1980), plaintiff claimed no-fault benefits for lost wages and psychiatric care she incurred because of the death of her daughter in an automobile accident. In denying no-fault benefits the Michigan Court of Appeals said:

"Plaintiff's injury did not arise out of the 'ownership, operation, maintenance or use of a motor vehicle.' Rather, her injury arose out of the death of her daughter which in turn arose out of the operation of a motor vehicle.

We note that the term 'arising out of' does not necessitate a finding that the injury was directly and proximately caused by the use of the vehicle. On the other hand it cannot be extended to something distinctly remote. Each case depends on its own facts. *Shinabarger v. Citizens Mutual Insurance Co.*, 90 Mich. App. 307, 313–314, 282 N.W.2d 301 (1979). As a general rule, the injury must be foreseeably identifiable with the normal use of the vehicle. *O'Key v. State Farm Mutual Automobile Insurance Co.*, 89 Mich.App. 526, 280 N.W.2d 583 (1979), *Kangas v. Aetna Casualty & Surety Co.*, 64 Mich.App. 1, 235 N.W.2d 42 (1975)." 94 Mich.App. 762, 764–765, 290 N.W.2d 76, 77.

In *D.A.I.I.E. v. Higginbotham*, 95 Mich. App. 213, 290 N.W.2d 414 (1980) a wife shot by her estranged husband while trapped in an automobile was denied no-fault benefits on the grounds her injuries were not foreseeably identifiable with the normal use of the vehicle.

The latest Michigan case in this line is *Dowdy v. Motorland Insurance Company*, 97 Mich.App. 242, 293 N.W.2d 782 (1980), in which the Michigan Court of Appeals rejected a claim for no-fault benefits by a truck driver who was injured in the course of unloading his truck when a pile of steel from a just unloaded adjacent truck collapsed on him. The Court of Appeals reviewed the cases beginning with *Kangas, supra,* and again emphasized the need to find a causal connection between the injury and the ownership, operation, maintenance, or use of the vehicle and that the causal connection was something more than a situation where the vehicle "fortuitously" provides the setting for the injury (At p. 246, 293 N.W.2d 785).

2.

Assuming that "loading and unloading" is an integral part of "use" the Michigan law interpreting "loading and unloading" does

nothing to advance Ford's position. Michigan follows the completed operations rule. This means that an insurance policy which used the words "loading and unloading" covered the entire process involved in the movement of an article without distinguishing between loading and preparatory activities or unloading and delivery. *Allstate Insurance Company v. Valdez*, 190 F.Supp. 893 (E.D.Mich.1961) (passenger shot unloading shotgun preparatory to placing it into truck as required by law held covered); *Selective Insurance Company v. Hartford Accident & Indemnity Company*, 213 F.Supp. 3 (E.D.Mich.1963) (door closed on store employee's finger while truck driver was leaving store after delivery held covered); *St. Paul Mercury Insurance Company v. Huitt*, 215 F.Supp. 709 (W.D.Mich.) *aff'd*, 336 F.2d 37 (6th Cir. 1964) (construction worker injured when boom of crane unloading concrete from truck broke held covered).[8]

■ Again, each of these cases say there must be a sufficient causal relation between the action which resulted in the injury and the need to carry out the loading or delivery (unloading) and that action was an integral part of the loading or unloading.

## V.

### A.

■ The cases in Michigan interpreting Section 3105(1), an interpretation to be carried over to Section 3121(1), have been uniform in requiring that the role of the motor vehicle be direct, not remote; that the injury be reasonably identified with the use of the motor vehicle and not fortuitous; and that each case depends on its own facts.

Here, it is undisputed that the catalyst went from the tank truck into the resin tank without anything untoward occurring. It was in the resin tank for some twenty-eight minutes before the explosion. During that period the catalyst obviously was inter-acting with the resin; yet that inter-action had nothing to do, however, with the act of unloading or the use of the tank truck as a motor vehicle. The inter-action had to do with the contents of the resin tank. Had the resin tank been empty or been used for an inert liquid nothing would have happened.[9]

Furthermore, control of the tank truck here was with Ford. It was as if the tank had been dropped off and parked. Unloading could have been delayed. Delivery was effective when Ford took over control. At that point Refiners became a passive actor in the event to follow.

### B.

On the record before me I find there was no direct causal relationship between the use of the tank truck as a motor vehicle and the property damage suffered by Ford. I find that the explosion and subsequent property damage was not reasonably identifiable with the use of the tank truck as a motor vehicle; rather I find it was a fortuitous occurrence, caused by an intervening independent act. If the Ford employee had not made a mistake by connecting and pumping the catalyst into the wrong Ford tank with the Ford pump there would have been no explosion and no damage.

The underlying principal for imposing no-fault liability on a motor vehicle in relation to tangible personal property was the legislative view that tangible personal property was almost never the actor, *Shavers, supra,*

---

**8.** The "completed operations" rule is not universal; *see, Kurdziel v. Pittsburgh Tube Company,* 416 F.2d 882 (6th Cir. 1969), for a more restrictive view in Ohio.

**9.** In *Liberty Mutual Insurance Company v. Hartford Accident & Indemnity Co.,* 251 F.2d 761 (7th Cir. 1958) the insured's truck took empty or partially empty paint cans to a city dump and unloaded the truck in a section reserved for burning rubbish. Twenty-nine hours after unloading, a blaze in the dump reached the cans; an explosion ensued causing damage to the plaintiff who was walking through the dump. The Court of Appeals held that the unloading was completed when the cans were placed in the dump and truck left the dump. It declined to hold that the accident had been caused by the use of or the unloading of the truck.

402 Mich. 554 at 631 particularly footnote 58, 267 N.W.2d 72. Here the actor was neither the tank truck nor the driver of the tank truck but rather the Ford employee and the contents of Ford's resin tank. This is not to say that I have made a finding of fault on the part of Ford but rather the action of the Ford employee and the nature of Ford's property, i. e., the resin tank, was the cause of the damage.

## VI.

As previously discussed, the Michigan legislature in designing no-fault automobile liability intended to reform the system of compensation for injury to persons and property arising out of the ownership, operation, maintenance or use of automobiles. One of the elements in the reform was a reallocation of the payment of insurance reparations for damages to property from the property insurance system to the motor vehicle insurance system. Formerly when property and a motor vehicle were involved in an accident the property insurance system usually paid for the damage and through subrogation obtained reimbursement from the motor vehicle insurance system if the motor vehicle was at fault which almost always is the case. Section 3121 of the Act was designed to eliminate the need for fault finding by effectuating a shift in every case where property and a motor vehicle were involved in the accident.

When a court, however, has to make a choice because the circumstances give rise to the "accidental damage" are ambiguous, it must I believe be sensitive to the consequences of the choice it makes. The choice determines which system, property or motor vehicle, will bear the burden of the cost of the damages. The legislature mandated the shift because property was inert and passive and a non-actor. Where the accidental damage arises because the owner of the property was the active force in occasioning the damage it seems to me that logic of the situation requires the property

system to bear the cost of the damage; to hold otherwise would distort legislative intent.[10]

Ford's motion for summary judgment will be DENIED. INA's motion for summary judgment will be GRANTED.

SO ORDERED.

---

**10.** The Supreme Court of Michigan is sensitive to questions of allocations. *See, McClure v. General Motors Corporation* (On Rehearing) 408 Mich. 191 at 209, 289 N.W.2d 631 (1980) (Opinion of Justice Levin for affirmance).